HEATHER DAVIS, CA SBN 239372
heather@protectionlawgroup.com
AMIR NAYEBDADASH, CA SBN 232204
amir@protectionlawgroup.com
PRISCILLA GAMINO, CA SBN 315404
priscilla@protectionlawgroup.com
BRENDAN J. BURTON, CA SBN 323495
brendan@protectionlawgroup.com
**PROTECTION LAW GROUP, LLP**
149 Sheldon Street
El Segundo, California 90245
Tel: (424) 290-3095 / Fax: (866) 264-7880

*Attorneys for* Plaintiff
S.B.C.W. CONSULTING, INC. dba 76 FORD EXIT,
individually and on behalf of all others similarly situated

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.B.C.W. CONSULTING, INC. dba 76 FORD EXIT, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>TSYS MERCHANT SOLUTIONS, LLC, a Delaware limited liability company; TSYS ADVISORS, INC., a Georgia corporation; TSYS ACQUIRING SOLUTIONS, L.L.C., a Delaware limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.: 2:24-CV-3193<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

S.B.C.W. CONSULTING, INC. dba 76 FORD EXIT, by and through undersigned counsel, brings this action on behalf of itself and on behalf of all others similarly situated ("Plaintiff" and the "Class"), against TSYS MERCHANT SOLUTIONS, LLC; TSYS ADVISORS, INC.; and TSYS ACQUIRING SOLUTIONS, L.L.C. (collectively, "Defendants"). Plaintiff makes the following allegations based on personal knowledge of the facts pertaining to themselves and on information and belief upon investigation that is reasonable as to all other matters. Plaintiff alleges as follows:

## **NATURE OF THE ACTION**

1.      Plaintiff brings this action against Defendants on behalf of all consumers in California, who, within four years of the filing of this lawsuit have suffered from Defendants' multifaceted fraudulent scheme that operates as a fraudulent enterprise that utilizes dishonest sales tactics to induce merchants to use Defendants' card payment processing services.

2.      Once merchants are locked into contracts, Defendants incrementally drain them with numerous, unanticipated, improper, and excessive fees. Defendants also deliberately obscure and hide the upcharges so that merchants cannot reasonably detect that they have been improperly charged. Even if a merchant discovers that it is being charged fraudulently, it will take days, or even weeks, until the merchant is able to have the improper charges reversed (if reversed at all).

3.      This was not an isolated incident over a particular fee or a mistake by a legitimate business trying to serve their customers.  Instead, it was a business model of deception designed and executed by Defendants.

4.      This Action seeks to hold Defendants accountable for their improper and illegal business practices, including the assessment and seizure of unauthorized and excessive fees for merchant payment processing by Defendants.

5.      In today's business world, the vast majority of merchants must

accept payment for goods and services via credit and debit cards to stay competitive in the marketplace. In order to accept this method of payment, a merchant must utilize a payment processing service. As used throughout this Class Action Complaint, the word "merchant" should be taken to mean any person or entity that accepts credit or debit cards for payments. This includes non-profits, schools, churches, government agencies, individuals, and many persons or entities that are not traditional businesses. All are subject to the same improper treatment by Defendants.

6.      Merchants rely on the companies that provide this critical service to do so in accordance with fair and appropriate terms. Indeed, for many businesses, fees for card processing services are likely to be the third highest expense following labor and product costs. Even for a very small business, these fees can easily exceed $100 per month. Merchants on average effectively pay 2-3% of card transaction revenue to the various participants in the payment processing industry. As described below, merchants are promised such rates by Defendants but end up paying much more based on improper billing practices.

7.      The card processing system can be a difficult one to understand, with many involved parties. For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

     a.  <u>The Card Issuer</u> – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which charges a fee whenever a customer uses one its cards for a transaction. These companies charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.20/transaction). This fee varies based on the type of card used. For example, the card issuing companies will charge a higher

fee for transactions involving a rewards credit card than a card with no rewards program.  These fees are generally known as "interchange rates."

b. <u>The Card Association</u> – the card associations (i.e., Visa, MasterCard, and Discover) also charge per transaction fees.  By way of example, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a fee known as the "NABU" ("Network Access Brand Usage") fee.  The card networks also charge various additional fees depending on the type of transaction.  These fees are generally known as "assessments."

c. <u>The Payment Processor</u> – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is debited, and the merchant's account is credited. During the relevant Class Period, Plaintiff and the Class have used Defendants TSYS MERCHANT SOLUTIONS, LLC; TSYS ADVISORS, INC.; and their subsidiaries as their payment processors. Defendants have been the payment processor for Plaintiff throughout the entirety of the Class Period alleged in this Complaint.

d. <u>The Member Bank</u> – only banks may be members of card associations. These member banks "sponsor" merchant acquirers and payment processors so they may process transactions through the card associations. During the Class Period, Defendants have been sponsored by First National Bank of Omaha and Wells Fargo.

e. <u>The Merchant Acquirer</u> – this is the company that markets the payment processor's services to merchants. Merchant acquirers essentially act as a "middle man" between merchants and payment processors.  They enroll merchants in payment processing services and usually provide

customer support to the merchant.  Merchant acquirers usually work with independent sales agents who sign up merchants.   The merchant acquirer then pays the agent based on a percentage of the processing fees obtained from "their" merchants. Defendant TSYS ACQUIRING SOLUTIONS, L.L.C. is a merchant acquirer and aggressively seeks to enter relationships to sign up merchants for Defendants' services.

8.     Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment reaches an agreement with a merchant acquirer (or its independent sales affiliates) to obtain such services.   The parties agree on the fees that the merchant will be charged, which commonly consist of two parts:

a. "Pass Through" Costs – these charges consist of fees imposed by card issuers and the assessments imposed by card associations. These are set costs incurred by the member bank that apply universally at any given time, regardless of the type or amount of the transaction or the identify of the merchant. These costs are set, unavoidable, and are "passed through" to the merchant.

b. Payment Processing Fees – these are the fees which the merchant is charged by the merchant acquirer for payment processing services. These fees are not uniform but can be varied or negotiated by the parties.

9.     The number of involved parties and moving pieces can make it difficult for merchants to understand whether they are only being charged agreed-upon fees.  Merchants thus rely on merchant acquirers (or their agents) to explain on the front end of their relationship exactly what fees will be charged.

10.     Unfortunately, Defendants take advantage of their position of power and merchant confusion by having Defendants' agents induce potential customers like Plaintiff to execute a standardized "Merchant Transaction Processing Agreement" ("Application") with the promise of low, straightforward, transparent

pricing. These sales agents, who act at the direction of and under the control of Defendants, seek to enroll merchants with various fraudulent tactics, such as omitting or concealing fee practices that they are aware will occur.

11.     Defendants aggressively perpetrate this scheme through various form documents. Defendants' standardized proposals and Applications intentionally omit and conceal key facts concerning the fees and rates they know they will eventually charge merchants if they sign on the dotted line.

12.     Defendants engage in this fraud to induce merchants to do business with Defendants. Indeed, Defendants know full well that if merchants knew the true nature and extent of the fees they would eventually be charged, the merchants would not agree to do business with Defendants.

13.     After inducing merchants to bind themselves to the standardized Application, Defendants then systematically cram merchants with fees that were either not agreed upon, not disclosed, were not sufficiently explained, and/or that exceed the rates promised or otherwise violate the express terms of the Application. For instance, Defendants inflated "pass through" costs and charged Plaintiff for services that were not agreed upon, also adding payment processing fees and imposing new junk fees.

14.     More importantly, Defendants format and craft their monthly statements in a manner designed to confuse and confound merchants, and to obscure and hide their overcharges and fraudulent charges so that merchants cannot reasonably detect that they have been improperly charged. For instance, Defendants describe charges using deceptive language that leads merchants to believe increases are being mandated by card associations, as opposed to being imposed merely to pad Defendants' bottom line.

15.     Defendants further this scheme by seizing the charged amounts from the merchant bank or credit accounts before the merchants receive statements.

16.     Defendants' mark-ups are assessed against merchants for the sole purpose of raising additional revenue at the merchant's expense. The challenged fees do not result from higher than anticipated costs suffered by Defendants. Rather, this additional revenue has been going straight to Defendants' bottom line as profit.

17.     Since at least 2014, Defendants have perpetrated this overbilling scheme. This case challenges the nature and amount of the fees imposed, and the tactics employed by Defendants in securing these contracts.

## PARTIES

18.     Plaintiff S.B.C.W. CONSULTING, INC. dba 76 FORD EXIT is a California corporation that operates a gas station and also provides hot and cold food and beverages. Plaintiff is owned and operated by H. Troy Farahmand and uses a legal address in Redlands, California. Plaintiff has been a payment processing customer of Defendants TSYS MERCHANT SOLUTIONS, LLC; TSYS ADVISORS, INC.; and TSYS ACQUIRING SOLUTIONS, L.L.C. since approximately 2014.

19.     Defendant TSYS MERCHANT SOLUTIONS, LLC ("TSYS Merchant") is a Delaware limited liability company that is headquartered in Jeffersonville, Indiana. According to its website, TSYS Merchant specializes in providing full-service, cloud-based credit and debit card transaction processing to merchants throughout the United States of America, and process over $32 billion in card sales annually. TSYS Merchant may be served with process via its registered agent – CT Corporation System, 330 N. Brand Blvd., Glendale, CA 91203.

20.     Defendant TSYS ADVISORS, INC. ("TSYS Advisors") is a Georgia corporation that is headquartered in Columbus, Georgia. According to its website, TSYS Advisors specializes in providing consulting services for payment processing to TSYS Merchant customers and potential customers. TSYS Advisors may be served with process via its registered agent – CT Corporation System, 330 N. Brand

Blvd., Glendale, CA 91203.

21.     Defendant TSYS ACQUIRING SOLUTIONS, L.L.C. ("TSYS Acquiring") is a Delaware limited liability company that is headquartered in Tempe, Arizona. According to its website, TSYS Acquiring specializes in providing technology-based commerce enabling services and support to acquirer and merchant service providers that offer a variety of electronic payment processing services to merchants.

22.     Plaintiff is ignorant of the identities of defendants Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. The Doe defendants may be individuals, partnerships, or corporations. Plaintiff is informed and believes, and thereon alleges, that, at all times mentioned herein, each of the Doe defendants was the parent, subsidiary, agent, servant, employee, co-venturer, and/or co-conspirator of each of the other defendants, and was at all times mentioned acting within the scope, purpose, consent, knowledge, ratification and authorization of such agency, employment, joint venture and conspiracy. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Doe defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by its conduct.

## JURISDICTION AND VENUE

23.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than California.

24.     This Court has personal jurisdiction over Defendants because they are

all registered to transact business in California and have engaged in a continuous and systematic course of doing business in California by offering their services to thousands of California citizens and companies. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

25.     Venue lies within this judicial district under 28 U.S.C. § 1391 and California Civil Code § 1780(d) because Defendants engaged in business in this District; a substantial part of the events and omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from those who reside in this District. That is, Defendants purposefully availed themselves of the protections and benefits of this District, which are the subject of the present Complaint.

## FACTUAL ALLEGATIONS

### *History of Defendants' Business*

26.     Defendants are a global payment processing company that offers a range of services and solutions for card issuers, merchants, and consumers. In 1959, Defendants were founded as a division of Columbus Bank and Trust (now Synovus), a regional bank in Georgia.

27.     Defendants began their business in 1970, by processing credit accounts for a Florida bank. This was Defendants' first third-party processing agreement. In 1974, Defendants began processing credit cards for other banks, and in 1983, Defendants became a public company through an initial public offering.

28.     Defendants are one of the largest payment processors in the United States credit card issuer market. Defendants provide services to over 3.5 million small- and medium-sized business merchant locations and more than 1,300 financial institutions across more than 100 countries. Defendants generate revenues

through the volume, rather than the amount, of transactions made on the cards they service.

29.    Importantly, Defendants developed their own proprietary Point of Sales ("POS") systems as well as proprietary, secure payment platforms. Under the service mark, THE TOTAL SYSTEM, Defendants' TS2 computer-based processing system, offered a full line of card support services, from credit approval to production and mailing of cards, to authorizing domestic and international purchases, preparing, and mailing of billing statements, and customer and merchant support.

30.    The TS2 allowed for rapid, seamless updates and changes to client products, and permitted banks to customize the system to their precise needs. The TS2 offered more flexible options than were previously available, and saved clients time and effort because they were able to identify and target the needs of their customers. The new proprietary system propelled Defendants' business to new heights, and international markets.

31.    Defendants grew rapidly in the following decades, expanding their client base, product portfolio, and geographic reach. Defendants acquired or partnered with several companies in the payment industry, such as Visa, Clarity Payment Solutions, First National Bank of Omaha, TermNet, Central Payment, ProPay, Netspend, and TransFirst. In fact, Defendants engaged in protracted campaign of gobbling up competitors to multiply their position in the merchant solutions business, acquiring numerous companies from 2011 onwards.[1]

---

[1]    *See    https://www.ledger-enquirer.com/news/business/article29236969.html; https://www.propay.com/en-US/Press-Articles/Press-Releases/TSYS-Completes-Acquisition-of-ProPay; https://www.businesswire.com/news/home/20160401005813/en/TSYS-Completes-Acquisition-TransFirst;*

32.     However, this all-consuming rapid expansion came at a cost. Defendants have been accused of unethical business tactics to gain and maintain their market position. Some of these allegation include:

    a.  Charging excessive and hidden fees to their clients and customers, such as application fees, monthly fees, minimum fees, and chargeback fees;

    b.  Imposing unfair and restrictive contracts and policies on their clients and customers, such as long-term agreements, early termination penalties, and non-compete clauses;

    c.  Manipulating and misleading their client and customers with false or incomplete information, such as overstating their capabilities, underestimating their costs, and omitting their risks; and

    d.  Violating the privacy and security of their clients and customers by mishandling their personal and financial data, such as exposing, selling, or losing their sensitive information;

33.     In February 2017, Defendants' lobbying of the Republican Party was credited for a bill that removed the Consumer Financial Protection Bureau's limits on overdraft fees. At least 10-12% of Defendants' business revenue came from these fees.

34.     In 2019, Defendants were acquired by Global Payments, another payment processing company, for $21.5 billion, creating one of the largest payment technology companies in the world. The newly combined company is publicly traded and has more than 24,000 employees worldwide.[2]

---

*https://www.businesswire.com/news/home/20180111005626/en/TSYS-Completes-Acquisition-Cayan-Accelerate-Position-Leading*

[2] *See https://www.bizjournals.com/atlanta/news/2019/05/28/global-payments-and-tsys-to-combine-in-merger-of.html?ana=e_n;   https://www.reuters.com/article/us-*

### *History of Third-Party Payment Processing in the United States*

35.     With the development of e-commerce, the COVID-19 pandemic, and the rise of online shopping, electronic online payments have become the preferred method of obtaining goods or services. These transactions are either done by the merchants themselves, or via third-party payment systems.

36.     Third-party payments are not just a simple payment channel, but rather are widely used in various fields such as agency receipt and payment, investment finance, online loans, and everyday transactions such as purchasing food, gas, clothing, and utilities, etc. In fact, just in 2022, credit cards alone accounted for over 36.3% of the in-store retail transactions.

37.     A "Third Party Payment Processor" is a service that allows businesses to accept online payments. These payment processors facilitate transactions between the customer and the business by transferring funds from the customer's bank or credit account to the business's bank account.

38.     A traditional "Merchant Account" is a type of bank account that enables businesses to accept payments in a variety of ways, but most commonly debit or credit cards and digital wallets. In this model, each business has a unique Merchant Account, and these accounts come with underwriting requirements and fees, such as setup fees, monthly fees, and transaction fees. Generally, Merchant Accounts also require a much longer setup process than Third-Party Payment Processors.

39.     Third-party Payment Processors aggregate all of their clients' transactions into a single Merchant Account, effectively giving businesses allow businesses to accept credit cards, debit cards, EBT cards, e-checks, and recurring payments without opening an individual merchant account. Unlike Merchant

----

*total-systems-m-a-global-payments/global-payments-to-buy-tsys-for-215-billion-in-latest-fintech-deal-idUSKCN1SY142*

Accounts, most Third-Party Payment Processors approve applicants within minutes, so sales can begin immediately.

40.     There are a few key differences between a Third-Party Payment Processor and a Merchant Account:

    a. Speed and Simplicity – setting up a Third-Party Payment Processor is quicker and easier than opening a Merchant Account, where the process can be lengthy and time consuming;

    b. Cost Structure – typically, Third-Party Payment Processors are supposed to offer a simple flat-rate fee, while Merchant Accounts often charge a mixture of setup fees, monthly fees, and variable transaction fees;

    c. Risk Management – because Third-Party Payment Processors aggregate transactions from many businesses, they often have superior and stricter fraud detection systems, allowing them to freeze accounts or hold funds more quickly; and

    d. Payment Flexibility – Third-Party Payment Processors support a wide range of payment methods and currencies, which can be beneficial for businesses that want to offer their customers more options (like Plaintiff's gas station).

    e. Affordability – Businesses can save money on the upfront and ongoing costs of opening and maintaining a Merchant Account (i.e., application fees, monthly fees, minimum fees, and chargeback fees). Businesses also benefits from the economies of scale of the Third-Party Payment Processor, as they can negotiate lower rates with the card networks and banks.

41.     Third-Party Payment Processors are supposed to offer a simple flat-rate fee versus the more complex Merchant Account fee structures. This is supposed

to allow the business owners more time and flexibility to run their business, rather than maintain their own Merchant Accounts.

42.     Third-Party Payment Processors are accessible, easy-to-use, and because they can come with a range of integrations, they are often more expensive and less transparent than Merchant Account options. Therefore, it is in the best interests of most small- to medium-sized businesses to integrate Third-Party Payment Processors most of the time.

### *The Supplemental Nutrition Assistance Program ("SNAP") or Cal-Fresh*

43.     The United States provides its low-income and indigent citizens with an auxiliary method of obtaining groceries and nutrition, commonly called "food stamps." This program is federally referred to as the Supplemental Nutrition Assistance Program ("SNAP").

44.     The SNAP program was established in its modern form by the Food Stamp Reform Act of 1977. The Act's purpose was to act as a safety net against hunger for Americans with low incomes. In California, the SNAP program is called Cal-Fresh.

45.     Originally, the Food Stamp Program was established by Henry Wallace, Secretary of Agriculture, in 1939 under the Roosevelt administration to help address both widespread unemployment and food surpluses. The Food Stamp Program ended in 1943, and it was eighteen (18) years before the government started a food assistance program again.

46.     In 1961, President John F. Kennedy launched a food stamp pilot program, which worked nearly identical to the previous program, except the food stamps were cheaper. The Kennedy pilot program was tested in regions around the country with great success. In 1964, President Lyndon Johnson signed the Food Stamp Act, making the program permanent.

47.     Various laws have modified, limited, or expanded the program since then, changing the eligibility requirements, work requirements, and levels of funding. Most notably, in 1977 under President Jimmy Carter, Congress eliminated the purchase requirement which meant the government started distributing the benefits to eligible families for free.

48.     The SNAP program is by far the largest antihunger program in the United States and, therefore, is a vital component of the welfare safety net for low-income Americans. SNAP is demonstrably effective in reducing hunger, food insecurity, and poverty, thereby reducing the effects of these conditions on public health.[3]

49.     In 2017, SNAP alone lifted 3.4 million people out of poverty, nearly half of them children, and it ranks third only to Social Security and Earned Income Tax Credits in its effectiveness in reducing poverty.[4]

50.     The SNAP program also benefits the economy with a multiplier effect that makes every $1 billion in SNAP benefits worth $1.5 billion in gross domestic product.[5]

51.     In California, the SNAP program was established in its modern form by the Food Stamp Reform Act of 1977. The Act's purpose was also to act as a safety net and ensure that low-income Californians didn't have to exhaust their assets – a reliable car, or modest savings – before getting help with food. In California, the program is referred to as Cal-Fresh.

52.     During the COVID-19 pandemic, both SNAP and Cal-Fresh were expanded to have increased benefit levels and expanded eligibility for Cal-Fresh.

---

[3] *See https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305361*
[4] *See https://www.census.gov/library/stories/2018/09/supplemental-nutrition-assistance-program-lifts-millions-out-of-poverty.html*
[5] *See https://ageconsearch.umn.edu/record/291963/*

53.     In sum, both SNAP and Cal-Fresh are the most widely available social safety net program in the United States. While other safety net programs are designed to assist specific groups, SNAP and Cal-Fresh are available to income-eligible citizens or permanent residents regardless of age, family composition, or participation in other safety net programs. Therefore, the ability to utilize and access both SNAP and Cal-Fresh benefits is a survival necessity for millions of Americans every day.

54.     The result is the creation of a need-based free market wherein merchants and vendors compete for these extra resources. This necessitates that merchants and vendors who sell goods into the stream of commerce have the appropriate systems and technology to sell their goods or produce to those qualify and have obtained SNAP and Cal-Fresh benefits.

### *The Development of Electronic Benefits Transfer ("EBT") Cards*

55.     From approximately 1988 through 2004, California developed the Electronic Benefit Transfer ("EBT") system. The EBT systems allows a recipient to authorize a transfer of their government benefits from a federal account to a retailer account to pay for products received. Benefits are delivered on an EBT debit card.

56.     In the 1980's, legislators expressed concern about the size and cost of the Food Stamp Program. Subsequent legislation limited participation by requiring households to meet a gross income test and decreasing the frequency of cost-of-living adjustments for allotments.

57.     In 1996, the Welfare Reform Act was passed by Congress, making a number of changes to the Food Stamp Program. These changes included giving states greater administrative control, limiting eligibility for able-bodied adults without dependents, and most importantly, officially adopting the EBT system for

benefit delivery. The EBT system was rolled out across the United States in 2002.

58.     Since 2004, __all__ eligible individuals receive their SNAP or Cal-Fresh benefits electronically and directly into an account they use like a debit card.

59.     The EBT system is designed to reduce fraud in the programs by creating an electronic record of each transaction and potential stigma resulting from the use of paper coupons. This means that any merchant or vendor who wishes to make goods or produce available to purchase to these individuals __must__ have the appropriate systems and technology to be able to accept EBT cards and run the transactions.

### The Re-Authorization of the Agricultural Act of 2014

60.     President Obama signed the Agricultural Act of 2014 (H.R. 2642), commonly known as the Farm Bill, on February 7, 2014. The Farm Bill re-authorized dozens of farm bill programs ranging from nutrition to agriculture. The Farm Bill authorized $956 billion over ten years, with nearly 80% ($756 billion) of the funding allocated to nutrition and food safety net programs.

61.     The Re-Authorization of the Agricultural Act of 2014 meant that many retailers, merchants, and vendors had either already signed up as registered SNAP- and Cal-Fresh-authorized stores, or wanted to.

### Merchants Are Required to Provide Their Own EBT Processing

62.     The EBT system revolutionized the way SNAP and Cal-Fresh benefits are issued. The EBT system has modernized SNAP and Cal-Fresh transactions, saved taxpayer dollars, and improved and streamlined the transaction process for clients, retailers, merchants, and the state and federal regulators.

63.     Prior to the 2014 Farm Bill, authorized retailers and merchants could receive free SNAP or Cal-Fresh EBT equipment from their home state.

64.     However, as enacted and required by the 2014 Farm Bill, retailers and

merchants who are already authorized to accept the USDA's SNAP or Cal-Fresh program benefits must arrange and pay for their own EBT equipment, supplies, and related services.

65. The 2014 Farm Bill, and with only a few exceptions, required all SNAP and Cal-Fresh retailers and merchants to lease or purchase EBT equipment and services through their chosen services provider no later than September 21, 2014. Retailers and merchants who already had equipment to process credit and debit cards had to contact their current processor about adding the EBT service to their already-existing equipment.

66. In fact, leading up to the passage of the 2014 Farm Bill, and in the years succeeding it, there was a massive influx of businesses who were flocking to select Third-Party Payment Processors to enable their business to start running EBT transactions. In fact, the number of SNAP- and Cal-Fresh-authorized stores doubled from 2007 to 2016. By 2016, convenience stores accounted for 45% of all SNAP- and Cal-Fresh-authorized stores.[6]

### *Defendants Induce Merchants to do Business with Promises of Low-Cost Pricing for EBT Processing*

67. Third-Party Payment Processors like Defendants were waiting in the wings to sign up as many of these new retailers, vendors, and merchants as possible into their predatory pricing and billing schemes and practices. Also, as mentioned above, because Third-Party Payment Processors offer much quicker applications and account approvals than Merchant Accounts, they received the bulk of the new applications.

68. Via their agents, Defendants approach and market to merchants who

---

[6]    *See*    https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=88089

are now forced to pay for their own EBT processing to use Defendants' services through promises of transparent, low cost pricing for EBT transactions. Merchants are attracted by promises of being able to save money by reducing processing fees for transactions that they now have to pay (formerly paid by the government). This approach is very appealing to merchants because payment process is a substantial business expense for them.

## INDIVIDUAL FACTUAL ALLEGATIONS

69.    Plaintiff is the owner and operator of two (now one) gas stations that have accompanying convenience and grocery marts. Plaintiff sold the second station in July 2022.

70.    Plaintiff's gas stations are capable of running both credit and debit cards. However, all credit card transactions must be processed through the oil companies. Gas stations do not have the option to sign up with third-party payment processors to run gasoline transactions.

71.    In or around July 2014, Plaintiff was notified of the 2014 Farm Bill, and upcoming changes that would need to be made to its business. Prior to this 2014 Farm Bill, the government would subsidize the EBT processing machines for merchants, vendors, and retailers already registered to accept SNAP and Cal-Fresh benefits.

72.    Both of Plaintiff's locations were already registered to receive SNAP- and Cal-Fresh-eligible customers to accept their benefits. However, with the introduction of the 2014 Farm Bill, Plaintiff would now be responsible for obtaining and maintaining its own equipment to accept the SNAP and Cal-Fresh benefits.

73.    Plaintiff called several companies to discuss options, pricing, and details of the potential services and contracts. Defendants' options were the best and cheapest. The deal Plaintiff made with Defendants was quite simple:

Defendants would provide monthly servicing and their proprietary POS system terminal in exchange for Plaintiff paying a $10.00 per month equipment rental fee, and $0.05 charge per EBT transaction fee processed by Defendants. It was also agreed that there would be a standard Payment Card Industry Data Security Standard ("PCI-DDS" or "PCI") Compliance fee of $24.00 per year. Plaintiff agreed to these terms and entered into the Third-Party Servicing Agreement ("Servicing Agreement" or "Agreement").

74.    Plaintiff began to notice that the amounts charged by Defendants were not reconciling with the payments received by Plaintiff.

75.    The card processing equipment provided by Defendants can only process EBT cards. Any attempt to process a Mastercard in Defendants' equipment is automatically rejected. Moreover, EBT cards have a pin number that patrons must enter in order for a transaction to occur while a Mastercard does not which would cause an "Error" or rejected transaction even if a patron were to use Defendants' EBT processing equipment for a Mastercard.

76.    For months, Defendants failed to provide Plaintiff with itemized statements. After months of phone calls requesting access to the itemized statements, Plaintiff got access to its electronic statements.

77.    Plaintiff noticed that each month Defendants were charging Plaintiff for miscellaneous items that were not agreed to in the Servicing Agreement or in the negotiations leading up to it. For example, Defendants would routinely charge Plaintiff for Mastercard "compliance fees" or "acquirer fees." Plaintiff or Plaintiff's managers had to call Defendants every single month to dispute or question charges that were unrelated and not agreed upon. Defendants were charging the fees prior to Plaintiff receiving the itemized statements, so there was not much Plaintiff could do.

78.    Thereafter, Plaintiff noticed that not only were Defendants charging

miscellaneous items outside the Agreement's terms such as the compliance and acquirer fees, Plaintiff and Plaintiff's managers noticed that Defendants began charging Plaintiff $0.25 per transaction under Mastercard even though Defendants' equipment cannot process Mastercard transactions.

79.    Plaintiff immediately notified Defendants that not only was this unacceptable, but that it violated the terms of Plaintiff's Servicing Agreement, which <u>only</u> called for EBT transactions, not credit card transactions. Defendants took Plaintiff's complaints and told Plaintiff that the charges were allowed under Plaintiff's Servicing Agreement, even though they were not, and every single negotiation Plaintiff had with Defendants leading up to the execution of the Servicing Agreement surrounded Plaintiff utilizing **<u>only</u>** the EBT servicing. Defendants did not reverse the charges or make any changes to Plaintiff's account and continued to charge Plaintiff each month for these fees and charges.

80.    Despite Plaintiff's continued inquiries about major credit card transactions like Mastercard transactions in its statements, Defendants continued making representations that the account would not be billed for any credit card activity, only for the EBT transactions processed while still making charges for credit card transactions that cannot be processed through Defendants' equipment.

81.    Defendants have also added and charged annual fees without any prior disclosure.

82.    Plaintiff has continued to call Defendants each month to dispute the charges and transaction fees to no avail. Defendants state there is nothing they can do about these unrelated, unnecessary charges.

## **CLASS ALLEGATIONS**

83.    As alleged herein, Plaintiff brings this lawsuit on behalf of itself and all others similarly situated (the "Class"), pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4) as follows:

**California Class:** All California current and former merchants, businesses, and/or customers who purchased, rented, and/or utilized any of the Defendants payment EBT processing services in California and paid more for fees outside of EBT transactions during the applicable limitations period up to and including final judgment of this action.

84.     Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, in a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigs of Defendants. Also excluded are the judge and court personnel in this case and any members of their immediate families. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Classes should be expanded or otherwise modified.

### *Requirements of Rule 23(a) Met*

85.     *Numerosity*: Fed. R. Civ. 23(a)(1). This action has been brought and may be properly maintained as a class action against Defendants under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure. The members of the Class are so numerous that individual joinder of all the members is impracticable. On information and belief, there are tens of thousands of merchants that have been damaged by Defendants' wrongful conduct as alleged herein. The precise number of Class members and their addresses is presently unknown to Plaintiff, but can readily be ascertained from Defendants' books and records. Class members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

86.     *Commonality and Predominance.* Common questions of law and fact predominate over any questions affecting individual class members. These common

legal and factual questions include, but are not limited to, the following:

    i.    Whether Defendants acted and continue to act fraudulently in inducing merchants, including Plaintiff and the other Class Members, to contract with Defendants;

    ii.    Whether Defendants made uniform misrepresentations to customers and potential customers regarding their servicing agreements such that reasonable consumers would be deceived into believing the transactions charged would match what was agreed upon in their servicing agreements;

    iii.    Whether Defendants' made false representations to Plaintiff and Class Members;

    iv.    Whether Defendants acted and continue to act fraudulently in crafting and formatting their monthly statements and the notice messages contained therein;

    v.    Whether Defendants are liable to Plaintiff and the other Class Members for imposing unauthorized fees on merchants for Defendants' own benefit;

    vi.    Whether Plaintiff and the Class are entitled to injunctive and/or declaratory relief;

    vii.    Whether Plaintiff and the Class are entitled to consequential damages, statutory damages, punitive damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct;

87.    *Typicality:* Plaintiff's claims are typical of the other Class Members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories. Further, Plaintiff and members of the Class were comparably injured through the uniform misconduct described above.

88.    *Adequacy:* Plaintiff will fairly and adequately protect the interests of

the Members of the Class in that they have no interests antagonistic to those of the other Members of the Class. Plaintiff has retained experienced and competent counsel. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firm, which has the financial and legal resources to meet the substantial costs and legal issues associated with type of consumer class litigation.

89. *Superiority:* A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and each of the other Class Members are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, thus rendering it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*

90. Plaintiff incorporates by reference and re-alleges as if fully stated herein each and every allegation set forth above.

91. California Business & Professions Code § 17200 prohibits "any

unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising."

92. By Defendants' actions and conduct as alleged herein, Defendants have committed one or more acts of unfair competition within the meaning of California Business & Professions Code § 17200 that constitute unfair, unlawful, and/or fraudulent business practices as those terms are defined under California law.

93. As alleged herein, Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendants' actions. Specifically, Plaintiff signed up for Defendants' third-party payment processing of EBT transactions for business use. In doing so, Plaintiff relied upon the representations referenced above. Plaintiff would not have signed up for Defendants' services had it known that Defendants wrongfully charged for services outside the scope of the parties' Agreement.

94. Defendants' business practices are unfair under the UCL because Defendants acted in a manner that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiff and the Class Members.

95. These business practices, described *supra,* include charging processing fees for transactions that were never processed nor could be processed. Plaintiff and the Class were overcharged for fees. Plaintiff and the Class Members utilized Defendants' EBT only equipment for EBT only transactions. Plaintiff and the Class Members were duped out of additional fees for other types of credit card transactions like Mastercard transactions when Defendants' equipment can only process EBT charges. These extra fees were hidden in statements for which Plaintiff and the Class Members expected to only have EBT transaction fees as they were using EBT only equipment.

96. Defendants' actions constitute fraud within the meaning of Cal. Civ. Code § 1709.

97.   **Unlawful Business Practices**: The actions of Defendants, as alleged herein, constitute illegal and unlawful practices committed in violation of California Business & Professions Code § 17200.

98.   As alleged herein, Defendants breached the parties' Agreement by charging for services outside the scope of the parties Agreement such as debit and credit card transactions. Additionally, Defendants also breach the covenant of good faith and fair dealing in the contract through its policies and practices as to compliance and acquirer fees as alleged herein. Lastly, Defendants have wrongfully converted property by erroneously collecting fees and charges from Plaintiff and the Class Members.

99.   Plaintiff and the Class Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

100.   **Unfair Business Practices**: California Business & Professions Code § 17200 also prohibits any "unfair…business act or practice."

101.   Defendants' acts, omissions, misrepresentations, and practices as alleged hearing also constitute "unfair" business, acts, and practices within the meaning of California Business & Professions Code § 17200, *et seq.*, in that Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct in the aggregate clearly outweighs any alleged benefits attributable to Defendants' conduct.

102.   There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

103.   Pursuant to section 17203 of the California Business & Professions Code, Plaintiff and the Class Members seek an order of this Court enjoining Defendants from continuing to engage in unlawful, unfair, or deceptive business

practices and any other act prohibited by law, including, but not limited to: (a) engaging in any of the illegal, misleading, unlawful, unfair, and/or deceptive conduct described herein; and (b) engaging in any other conduct found by the Court to be illegal, misleading, unlawful, unfair, and/or deceptive conduct.

104.   In addition, Plaintiff requests that this Court enter such orders or judgements as may be necessary to restore any Class Member in interest any money which may have been acquired by means of such illegal practices as provided in California Business & Professions Code 17203, and for such other relief as set forth below.

## **COUNT II**
### **DECEIT**
### **(California Civil Code § 1709)**

105.   Plaintiff incorporates by reference and re-alleges as if fully stated herein each and every allegation set forth above.

106.   One who willfully deceives another with intent to induce the person to alter his or her position to his or her injury or risk, is liable for any damage which he or she thereby suffers. Cal. Civ. Code § 1709.

107.   The elements of fraud, which give rise to the tort action for deceit, are a) misrepresentation (false representation, concealment, or nondisclosure; b) knowledge of falsity (or scienter); c) intent to defraud, i.e., to induce reliance; d) justifiable reliance; and e) resulting damage.

108.   Defendants represented to Plaintiff and the Class Members they were renting EBT equipment for EBT transactions and therefore only being charged for transactions for which they actually processed (the EBT transactions).

109.   Defendants represented their monthly statements were accurate.

110.   Defendants concealed the fact that their monthly statements included

fees for transactions that never occurred.

111.   Defendants did not disclose that Plaintiff and the Class Members were being charged extra fees, not for transactions made, but for Defendants' pecuniary gain.

112.   Defendants should have or did possess the requisite scienter because Defendants' rented equipment cannot process Mastercard transactions although they were charging Plaintiff and the Class Members for such transactions.

113.   Defendants' intent to defraud Plaintiff and the Class Members can be gleaned by the representations they fraudulently made to induce Plaintiff and Class Members into thinking that they were only getting charged for EBT transactions that were actually made.

114.   Plaintiff and the Class Members reasonably belief on Defendants' representations because, as consumers, they are entitled to rely on a corporation's representation, as this trust is quintessential to a viable marketplace.

115.   Plaintiff and the Class Members were damaged, in the form of remitting more fees than they otherwise would have, had Defendants not charged for nonexistent transactions.

## COUNT THREE
### NEGLIGENT MISREPRESENTATION

116.   Plaintiff incorporates by reference and re-alleges as if fully stated herein each and every allegation set forth above.

117.   Defendants and their sales agents or employees represented and continue to represent that they would not process credit and debit card transactions, assess certain fees to Plaintiff and the Class Members, and provide them with itemized monthly statements prior to charging their account.

118.   Defendants and their sales agents or employees represented and

continue to represent that they would only charge for transactions processed.

119.   The representations made by Defendants and their sales agents or employees were false in that Defendants did in fact charge Plaintiff and the Class Members for debit and credit card transactions that did not occur, did assess certain unlawful fees, and did charge Plaintiff and the Class these fees prior to them receiving monthly statements.

120.   Defendants made the representations, as alleged herein, without any reasonable basis for believing them to be true at the time of such representations.

121.   Defendants intended that Plaintiff and the Class rely upon such false representations.

122.   Plaintiff and the Class Members reasonably relied on Defendants' representations.

123.   Plaintiff's and the Class Members' reliance upon Defendants' representations, as alleged herein, was a substantial factor in causing Plaintiff and the Class Members harm.

124.   Plaintiff and the Class Members were harmed in an amount to be proved at the time of trial.

## COUNT FOUR
## CONSTRUCTIVE FRAUD
### (California Civil Code § 1573)

125.   Plaintiff incorporates by reference and re-alleges as if fully stated herein each and every allegation set forth above.

126.   Defendants committed constructive fraud by making the representations above, *supra*, to each individual utilizing Defendants third-party payment processing software and proprietary POS system.

127.   Defendants committed constructive fraud by failing to disclose various

facts to Plaintiff and the Class Members as set forth above.

128.   As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff and the Class Members were damages by being held accountable for Defendants' unlawful $0.25 charge per transaction for services not agreed to, being assessed compliance fees, acquirer fees, and chargeback fees, and having all money taken out prior to receiving any itemized electronic statement.

129.   In perpetrating the fraud alleged herein, Defendants acted in a willful, wanton, and malicious manner. Defendants acted with callous, conscious, and intentional disregard for the rights of Plaintiff and the Class Members, and with knowledge that their actions and conduct were substantially likely to vex, annoy, and injure Plaintiff and the Class Members, to Defendants' benefit and profit. As a result, Plaintiff and the Class Members are entitled to an award of punitive and exemplary damages against Defendants, pursuant to California Civil Code § 3294, in an amount according to proof at trial.

## COUNT FIVE
### CONVERSION

130.   Plaintiff incorporates by reference and re-alleges as if fully stated herein each and every allegation set forth above.

131.   Defendants had, and continue to have a duty to accurately charge, or not charge, consumers through the monthly credit statements to prevent the consumers' diminishment through their own wrongful acts.

132.   Defendants have wrongfully collected late fees, interest, compliance, fees, acquirer, fees, and annual fees from Plaintiff and the Class Members, and have taken specific and readily identifiable amounts in payment of these fees, and interest to satisfy them.

133.   Defendants have, and without proper authorization, assumed and

exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the Class Members, without legal justification.

134.   Defendants continue to retain these funds unlawfully without the consent of Plaintiff or the Class Members.

135.   Defendants intend to permanently deprive Plaintiff and the Class Members of these funds.

136.   These funds are properly owned by Plaintiff and the Class Members, not Defendants, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the Class Members.

137.   Plaintiff and the Class Members are entitled to the immediate possession of these funds.

138.   Defendants' wrongful conduct is continuing.

139.   As a direct and proximate result of this wrongful conversion, Plaintiff and the Class Members have suffered and continue to suffer damages.

140.   By reason for the foregoing, Plaintiff and the Class Members are entitled to recover from Defendants all damages and costs permitted by law, including all property that Defendants have wrongfully converted.

## COUNT SIX

### (Unjust Enrichment)

141.   Plaintiff incorporates by reference and re-alleges as if fully stated herein each and every allegation set forth above.

142.   As a result of Defendants' unlawful practice of charging credit and debit card processing fees outside of the parties' Agreement and rented equipment, as well as charging compliance fees, acquirer fees, and chargeback fees, all charged prior to itemized statements being received by customers, Defendants were enriched at the expense of Plaintiff and the Class Members.

143.   Defendants charged Plaintiff and the Class Members fees not agreed upon, compliance fees, acquirer fees, and chargeback fees, which were not legally applicable because they were outside the scope of actual transactions made.

144.   Thus, it is against equity and good conscience that Defendants be permitted to retain the ill-gotten gains received from Plaintiff and the Class Members.

145.   It would be unjust and inequitable for Defendants to retain the benefit, warranting restitutionary disgorgement to Plaintiff and the Class Members of all the monies paid for the late fees and interest, and/or all monies paid for which Plaintiff and the Class Members did not receive a benefit.

146.   As a direct and proximate result of Defendants' actions, Plaintiff and the Class Members have suffered damages in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all other members of the general public similarly situated, prays for relief and judgment against Defendants, jointly and severally, as follows:

1.   Certifying the proposed Class as requested herein with the named Plaintiff as the designated class representative and with its counsel appointed as class counsel;

2.   Awarding Plaintiff and those similarly situated actual, direct, compensatory, and treble damages;

3.   Awarding restitution and disgorgement of revenues is warranted;

4.   Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

5.   Award named Plaintiff a service award;

6.   Awarding statutory and multiple damages, as appropriate;

1  7.   Awarding attorneys' fees and expenses; and

2  8.   Providing any such further relief and the Court deems just and proper.

3

4  **JURY TRIAL DEMANDED**

5  Plaintiff hereby demands a jury trial as to all claims so triable.

6

7

8  Dated: April 18, 2024                    Respectfully submitted,

9                                           By:   */s/ Heather Davis*

10                                          Heather Davis (CA SBN: 239372)
                                            Amir Nayebdadash (CA SBN: 232204)

11                                          Priscilla Gamino (CA SBN: 315404)
                                            Brendan J. Burton (CA SBN: 323495)

12                                          **PROTECTION LAW GROUP, LLP**
                                            149 Sheldon Street

13                                          El Segundo, California 90245
                                            Email:

14                                              heather@protectionlawgroup.com
                                                amir@protectionlawgroup.com

15                                              priscilla@protectionlawgroup.com
                                                brendan@protectionlawgroup.com

16                                          Telephone: (424) 290-3095

17                                          *Counsel for Plaintiff*
                                            S.B.C.W. CONSULTING, INC. dba 76

18                                          FORD EXIT, individually and on
                                            behalf of all others similarly situated

19

20

21

22

23

24

25

26

27

28